599 S.E.2d 709

**Arch A. MOORE, Jr., Petitioner Below, Appellant,**

v.

**CNA INSURANCE COMPANY, D/B/A CONTINENTAL CASUALTY COMPANY, Respondent Below, Appellee.**

**No. 31637.**

Supreme Court of Appeals of West Virginia.

Submitted: April 28, 2004.

Filed: June 30, 2004.

---

James A. Varner, Esq., Tiffany R. Durst, Esq., McNeer, Highland, McMunn & Varner, Clarksburg, for Appellant.

Jeffrey A. Holmstrand, Esq., McDermott & Bonenberger, PLLC, Wheeling, for Appellee.

PER CURIAM.

In the instant case, the appellant, former Governor Arch A. Moore, Jr., filed a complaint against CNA Insurance Company, d/b/a Continental Casualty Company ("CNA"), the appellee, on September 26, 2000. In that complaint, Governor Moore asserted a breach of contract claim arising from CNA's refusal to provide a defense for him in *State of West Virginia v. Moore*, Civil Action No. 2:90–0747, in the District Court for the Southern District of West Virginia on August 4, 1990. The parties agreed to submit cross-motions for summary judgment to the circuit court. Subsequently, on April 7, 2003, the circuit court concluded that the

essence of the State's claims against Governor Moore were outside the scope of the State's policy coverage and thus, CNA had no duty to provide Governor Moore a defense for the charges against him. Governor Moore now appeals the circuit court's order granting summary judgment to CNA. After reviewing the facts of the case, the issues presented, and the relevant statutory and case law, this Court affirms the decision of the circuit court.

## I.

### FACTS

On September 26, 2000, Arch A. Moore, Jr.,[1] the appellant, filed a complaint against CNA Insurance Company, d/b/a Continental Casualty Company ("CNA"), the appellee, in the Circuit Court of Marshall County. In that complaint, Governor Moore asserted a breach of contract claim arising from CNA's refusal to provide a defense for him in *State of West Virginia v. Moore*, Civil Action No. 2:90–0747, in the District Court for the Southern District of West Virginia filed August 4, 1990.[2]

The underlying State's civil action was instituted to recover all State funds and other benefits received by Governor Moore following his May 8, 1990 entry of a guilty plea to a five-count criminal indictment in the United States District Court for the Southern District of West Virginia. In Count One, Governor Moore admitted that he obtained the Office of Governor of the State of West Virginia in 1984 by accepting illegal cash contributions and by illegally distributing cash to influence the election. In Count Two, Governor Moore confessed that he agreed to and accepted more than five hundred thousand dollars from Kizer coal companies in exchange for his illegal promise to help secure a refund from West Virginia's Black Lung Fund. Moreover, in Counts Three and Four, Governor Moore conceded that he failed to

---

1. Governor Moore was the Governor and Chief Executive Officer of the State of West Virginia from January 1985 to January 1989; this is the term of his governorship at issue. Governor Moore, West Virginia's only three-term Governor, also served two consecutive terms of office from 1969–1977.

2. At all times relevant to this appeal, the State of West Virginia was insured under a policy of insurance issued by CNA.

report as income the money which he received illegally. Finally, in Count Five, Governor Moore acknowledged that he obstructed justice by lying and arranging for others to lie to cover up his unlawful acts.

With regard to the State's subsequent civil action, Governor Moore contends that CNA had a duty to defend him against the claims contained in the federal complaint. As such, on August 6, 1990, he forwarded the State's complaint to Robert Corey, the Director of the State Board of Risk and Insurance Management, requesting coverage under the terms of CNA's insurance policy. On September 27, 1990, Kevin Cushing, a claims specialist for CNA, informed Governor Moore that coverage would be denied. Subsequently, in January of 1996, Governor Moore, through private counsel, settled the State's civil action against him and agreed to pay the State the sum of $750,000.

On September 26, 2000, one day prior to ten years after CNA refused to defend him, Governor Moore filed his present complaint in the circuit court against CNA.[3] Thereafter, Governor Moore and CNA entered into a stipulation of certain facts for purposes of submitting cross motions for summary judgment on the insurance coverage issues. On April 7, 2003, the circuit court denied Governor Moore's motion for summary judgment, and granted CNA's motion for summary judgment, finding that CNA had no duty to provide a defense for Governor Moore. This appeal followed.

## II.

### STANDARD OF REVIEW

Governor Moore contends that the circuit court erred in granting summary judgment to CNA. In Syllabus Point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), this Court stated that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Pursuant to Rule 56 of the West Virginia Rules of Civil Procedure, summary judgment is required when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In Syllabus Point 3 of *Aetna Casualty & Surety Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963), this Court held: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."

Moreover, "[s]ummary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syllabus Point 2, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995). In addition, "[i]f the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure." Syllabus Point 3, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995).

Furthermore, the instant appeal requires this Court to review the terms of the insurance policy at issue herein. Generally, "[d]etermination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law." Syllabus Point 1, *Tennant v. Smallwood*, 211 W.Va. 703, 568 S.E.2d 10 (2002). Moreover, "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgement, shall be

---

**3.** Our state has a ten year statute of limitations for suits alleging a breach of contract. *See* W. Va.Code 55–2–6 (1923); *McKenzie v. Cherry River*

*Coal & Coke Co.*, 195 W.Va. 742, 466 S.E.2d 810 (1995) (per curiam).

reviewed *de novo* on appeal." Syllabus Point 2, *Riffe v. Home Finders Assocs., Inc.*, 205 W.Va. 216, 517 S.E.2d 313 (1999). *See also* Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."). With these standards in mind, we proceed to consider Governor Moore's arguments.

## III.

## DISCUSSION

Governor Moore argues that the circuit court erred in denying his motion for summary judgment and granting summary judgment in favor of CNA, resulting in a holding that the State's insurance coverage did not apply to the State's claims against him. Governor Moore asserts that the circuit court erred by failing to apply established general principles of insurance law to the exclusionary language at issue in the CNA subject policy of insurance. Governor Moore further maintains that CNA incorrectly denied him a defense because even in cases where an insurance carrier has no duty to indemnify its insured for a claim, the insurer may, nonetheless, be obligated to provide a defense. Governor Moore continues that in such cases an insurer may provide a defense under a reservation of rights pending resolution of the factual and/or legal issues or file a declaratory judgment action to obtain a ruling on the coverage issue. Governor Moore states that this Court has repeatedly recognized that an insurer's duty to defend is tested by whether the allegations in the complaint against the insured are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy.

CNA responds that the key issue for this Court to consider is whether the essence of the State's suit was foreign to the risk insured against under the policy issued to the State of West Virginia. If so, CNA argues that it had no duty to defend or indemnify Governor Moore. Additionally, CNA maintains that there is simply no way to read the allegations of the complaint, along with Governor Moore's guilty plea, in a fashion that creates a duty to defend under the policy. To this end, CNA points out that the allegations against Governor Moore relate to improper and illegal conduct outside the scope of his employment undertaken solely for purely personal gain rather than in furtherance of any governmental interest with no legitimate relationship to the discharge of his duties as Governor of West Virginia.[4]

We agree with CNA and affirm the circuit court's decision that a jury could not have reasonably concluded that Governor Moore should have received coverage from CNA for the State's civil lawsuit. In reaching this conclusion, we looked to the first exclusion to CNA's insurance contract issued to the State. Specifically, the contract explains that the wrongful act provision applies only to claims within the scope of its coverage. According to the insurance contract as provided in the record before this Court, the definition of a wrongful act is as follows:

> "Wrongful Act" shall mean any actual or alleged error or misstatement or act or omission or neglect or breach of duty including malfeasance, misfeasance, and nonfeasance by the insureds in the discharge of their duties with the "named insured," individually or collectively, or any matter claimed against them solely by reason of their being or having been insureds.

In this case, the State's civil action asserted claims against Governor Moore based solely upon his guilty plea in federal court. In addition, the State's civil complaint explicitly alleged that the acts were done to enable Governor Moore "to acquire the office

---

4. CNA further disputes Governor Moore's contention that he was a "Named Insured" under the policy since he was Governor and Chief Executive Officer of the State of West Virginia. The definition of an insured as proscribed by the contract provides, " 'Insured' shall mean the 'named insured' and those persons who were, are now or shall be duly elected or appointed officials or members or employees of the 'named insured.' " We agree with CNA that the State of West Virginia and its various governmental bodies are the "Named Insureds" under the policy, while the officials of the state, including Governor Moore, whether elected or appointed, are the "Insureds."

of governor illegally and to conduct the affairs of that office for his personal benefit rather than for the well-being of the State of West Virginia." Moreover, the policy contains specific exclusions which precluded CNA's duty to defend Governor Moore. To this end, the contract explains that,

The company shall not be liable to make any payment in connection with any claim made against the insured:

1. Based upon or attributable to their gaining in fact any personal profit or advantage to which they were not legally entitled, including remuneration paid in violation of law as determined by the courts;

In *Horace Mann Ins. Co. v. Leeber,* 180 W.Va. 375, 378, 376 S.E.2d 581, 584 (1988), we provided,

At the outset we set forth a few general principles, also set forth by this Court in *Aetna Casualty & Surety Co. v. Pitrolo,* 176 W.Va. 190, 194, 342 S.E.2d 156, 160 (1986). First, any ambiguity in the language of an insurance policy is to be construed liberally in favor of the insured, as the policy was prepared exclusively by the insurer. This principle applies to policy language on the insurer's duty to defend the insured, as well as to policy language on the insurer's duty to pay. Second, the duty of an insurer to defend an insured is generally broader than the obligation to provide coverage, that is, to pay a third party or to indemnify the insured, in light of the language in the typical liability policy which obligates the insurer to defend even though the suit is groundless, false or fraudulent. Third, an insurer's duty to defend is normally tested by whether the allegations in the complaint against the insured are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy.

Likewise, "[w]here the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." Syllabus Point 5, *National Mut. Ins. Co. v. McMahon & Sons, Inc.,* 177 W.Va. 734, 356 S.E.2d 488 (1987). *Accord American States Ins. Co. v. Tanner,* 211 W.Va. 160,

165, 563 S.E.2d 825, 830 (2002); Syllabus Point 4, *Russell v. Bush & Burchett, Inc.,* 210 W.Va. 699, 559 S.E.2d 36 (2001). For this reason, then, "[a]n insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." Syllabus Point 7, *Id.*

Furthermore, in Syllabus Point 2 of *Russell v. State Auto. Mut. Insurance Co.,* 188 W.Va. 81, 422 S.E.2d 803 (1992), we held that "[l]anguage in an insurance policy should be given its plain, ordinary meaning. Syl. Pt. 1, *Soliva v. Shand, Morahan & Co.,* 176 W.Va. 430, 345 S.E.2d 33 (1986)." Therefore, " ' "[w]here the provisions in an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." ' " Syllabus Point 3, *American States Ins. Co. v. Tanner,* 211 W.Va. 160, 563 S.E.2d 825 (2002) (citations omitted). It is only when policy language is ambiguous that the insured is entitled to a liberal reading of the policy. *See, e.g.,* Syllabus Point 4, *Kanawha Valley Radiologists, Inc. v. One Valley Bank, N.A.,* 210 W.Va. 223, 557 S.E.2d 277 (2001) ( " ' "It is well settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured." Syl. pt. 4, *National Mut. Ins. Co. v. McMahon & Sons, Inc.,* 177 W.Va. 734, 356 S.E.2d 488 (1987).' Syllabus point 4, *Riffe v. Home Finders Associates[, Inc.],* 205 W.Va. 216, 517 S.E.2d 313 (1999).").

Moreover, we have also held that "[I]ncluded in the consideration of whether [an] insurer has a duty to defend is whether the allegations in the complaint . . . are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance polic[y]." Syllabus Point 3, in part, *Bruceton Bank v. United States Fidelity and Guaranty Insurance Co.,* 199 W.Va. 548, 486 S.E.2d 19 (1997). Thus, "[a]ny question concerning an insurer's duty to defend under an insurance policy must be construed liberally in favor of an insured where there is any question about an insurer's obligations." Syllabus Point 5 of *Tackett v. American Mo-*

*torists Ins. Co.,* 213 W.Va. 524, 584 S.E.2d 158 (2003), *Accord Leeber,* 180 W.Va. at 378, 376 S.E.2d at 584. Here, we believe the language of the State's insurance policy is clear and unambiguous. When its terms are applied in light of the State's complaint, we have no trouble in affirming the circuit court.

Governor Moore's strongest argument is his reliance on the recent decision from this Court in *Tackett v. American Motorists Ins. Co.,* 213 W.Va. 524, 584 S.E.2d 158 (2003), which states that the duty of an insurer to defend is generally broader than the obligation to provide coverage, *i.e.,* to pay a third party or to indemnify the insured. In *Tackett,* 213 W.Va. 524, 528, 584 S.E.2d 158, 162 (2003), we explained:

> A contract for indemnification from loss typically also includes a provision whereby the insuring entity agrees to provide legal representation to said insured with respect to any claims filed against him/her for which the subject policy provides coverage. This type of arrangement has come to be known as the insurer's duty to defend. *See, e.g.,* Black's Law Dictionary 523 (7th ed.1999) (defining "duty-to-defend clause" as "[a] liability-insurance provision obligating the insurer to take over the defense of any lawsuit brought by a third party against the insured on a claim that falls within the policy's coverage"). Unquestionably, the terms of the pertinent insurance contract govern the parties' relationship and define the scope of coverage as well as the existence of the insurer's duty to defend its insured.

We note that *Tackett* is factually distinguishable from Governor Moore's case. In that case, Mr. Tackett, who was employed as an assistant manager by Gadzooks, Inc., a nationwide clothing retailer with a store located in the Huntington Mall, assisted a fifteen-year-old female, who was a customer at the store. She subsequently filed a complaint against Gadzooks and Mr. Tackett alleging that while she was shopping at Gadzooks, Mr. Tackett subjected her to various acts of sexual misconduct. The suit against Mr. Tackett alleged that,

> On or about April 19, 1997, the Plaintiff [K.M.L.], while shopping in the Defendant's [Gadzooks'] Store, was attended to by the Defendant, Tackett. At said time and place, the Plaintiff, [K.M.L.], was fifteen (15) years of age. At said time and place, and while the Plaintiff was within the said retail Store, the Defendant, Tackett, while in the course and scope of his employment, sexually harassed, molested, and violated the infant Plaintiff, by, among other things, making sexual innuendos to the Plaintiff; touching the Plaintiff on various parts of her body, including her breasts; entering the sanctity of her dressing room, when the said infant Plaintiff was disrobed while trying on clothes; reaching his hands under the blouse that the Plaintiff was trying on; and by doing all of the above in front of another individual.

213 W.Va. at 526–527, 584 S.E.2d at 160–161.

As a result of this complaint, American Motorists, from whom the corporate offices of Gadzooks had obtained a commercial general liability insurance policy, provided counsel to represent the Huntington Gadzooks store in its defense of this lawsuit. American Motorists refused, however, to represent Mr. Tackett in this matter. Consequently, Mr. Tackett was required to obtain his own defense counsel. Ultimately, the plaintiffs reached and entered into a settlement agreement with the defendants, Gadzooks and Mr. Tackett. 213 W.Va. at 527, 584 S.E.2d at 161. Nonetheless, we found that American Motorists incorrectly refused to provide a defense to Mr. Tackett.

In this case, the most glaring distinction between Governor Moore's situation and the facts before us in *Tackett* is the fact that on May 8, 1990, Governor Moore pled guilty, in the United States District Court for the Southern District of West Virginia, to criminal charges including mail fraud, extortion, filing false tax returns, and obstruction of justice.[5] Specifically, unlike the defendant in

---

5. *See United States v. Moore,* 931 F.2d 245 (4th Cir.1991) (rejecting challenge to guilty plea entered by Arch A. Moore to charges that he committed bribery and extortion while Governor of West Virginia).

*Tackett* who did not plead guilty to *any* criminal acts, Governor Moore *admitted* that he obtained the Office of Governor of the State of West Virginia in 1984 by defrauding the state of its salary and benefits by accepting illegal cash contributions (funneling $100,000 into his 1984 campaign fund) and by illegally distributing cash to influence the election; extorting $573,000 from a coal operator, H. Paul Kizer, in 1985 in exchange for Governor Moore's illegal promise to help secure a refund from West Virginia Black Lung Fund; filing false income tax returns in 1984 and 1985 by failing to report as income, money which he received through his illegal actions; and obstructing justice by lying and arranging for others to lie to cover up his unlawful acts. Moore was sentenced by a federal district judge to five years and ten months in prison and fined $170,000. As previously discussed, the State's civil action was based solely upon Governor Moore's admission of guilt to the criminal charges against him filed in federal court. In *Tackett*, the issue of the guilt of the defendant was still in question. Put another way, in *Tackett* the circuit court was dealing with mere allegations, while in Governor Moore's case the factual determinations were already settled as provided by his guilty plea.

As a fall back position Governor Moore, in spite of his guilty plea to criminal charges, argues that his factual and legal guilt was thrown into question by the opinion in *West Virginia v. Moore*, 895 F.Supp. 864 (S.D.W.Va.1995), which dismissed several of the State's legal theories against Governor Moore. He contends that the Federal District Court largely cleared him of any wrongdoing and that CNA could not rely on the guilty pleas in determining the scope of coverage (and the corresponding duty to defend). We have, however, only recently rejected the exact same legal argument that Governor Moore asserts. In *Lawyer Disciplinary Bd. v. Moore*, 214 W.Va. 780, 787, 591 S.E.2d 338, 345 (2003), where we denied Governor Moore's Petition for Reinstatement of his license to practice law in West Virginia, we explained that the Hearing Panel Subcommittee of the Lawyer Disciplinary Board Panel's Recommendation states:

... Moore overstates the finding of that case. The lawsuit was brought against Moore to collect money paid by the State of West Virginia Occupational Pneumoconiosis Fund and others as a result of Moore's criminal conduct. Many of the counts were dismissed, but not because the Court concluded that Moore was an innocent man. Rather, the Court concluded that the State failed to demonstrate that it had actually suffered a financial loss as a result of Moore's criminal conduct. Moreover, Judge Williams concluded that there was evidence that Moore had unjustly enriched himself when he took money from Kizer and others:

> ... the Court finds that the State has presented a genuine issue of material fact as to whether Moore was unjustly enriched through his conduct as Governor. After all, it is undisputed that Moore received unlawful campaign contributions, as well as a substantial payment from Kizer. Because the State could persuade a jury that those payments constituted unjust enrichment, the Court will permit the State to proceed to trial on this claim. Accordingly, the Court denies Moore's motion for summary judgment on Count XII of the Amended Complaint.

*West Virginia v. Moore*, 895 F.Supp. at 874–875. While the State of West Virginia may have presented insufficient evidence to establish injury caused by Moore's alleged racketeering activity, the Court accepted as fact that Moore had received a portion of Kizer's refund as a kickback from Kizer and that, by his plea, Moore had admitted to extorting money which was not lawfully due and owing to him. *State v. Moore*, 895 F.Supp. at 867.

We further provided:

Our review of the Hearing Panel's Recommendation and the materials in the record leads us to conclude that the Hearing Panel's assessments are well-founded. Our conclusion in this regard is supported by the facts in the record before us, by the opinion of this Court in *Committee on Legal Ethics of the West Virginia State Bar v. Moore*, 186 W.Va. 127, 411 S.E.2d

452 (1991), and by the opinions of two federal judges who reviewed the petitioner's attempts to withdraw his plea. 214 W.Va. at 787, 591 S.E.2d at 345.

We believe, given the facts of this case, if we were to find that Governor Moore should have been provided a defense to the State's claims, it would have created a nearly unlimited duty to defend in future cases and would require insurers to defend an insured regardless of the circumstances. To do so, we think would deprive insurers of the benefit relating to scope of coverage that they bargained for and expose them unfairly to boundless claims of bad faith. We further believe that the duty to defend cannot be triggered by pure speculation as to conduct or causes of action that are not either set forth in, or fairly suggested by, the allegations of the complaint. In this case, the allegations against Governor Moore were set forth clearly by the State's complaint and were undeniably predicated solely upon Governor Moore's guilty plea. As such, the law is clear that collateral estoppel prevents Governor Moore from relitigating either his guilt for the crimes charged or the facts giving rise to those crimes. *See e.g., State ex. rel. Leach v. Schlaegel,* 191 W.Va. 538, 447 S.E.2d 1 (1994); *Baber v. Fortner,* 186 W.Va. 413, 412 S.E.2d 814 (1991). *See also West Virginia v. Moore,* 897 F.Supp. 276 (S.D.W.Va.1995) (detailing facts that Governor Moore's guilty plea established his guilt and estopped him denying the essential elements of his guilt). Additionally, it is important to recognize that Governor Moore pled guilty to *every* count of the federal criminal indictment against him. To this end, his guilty plea to the criminal charges was the sole foundation for the State's subsequent civil action. Consequently, it is clear that the claim against Governor Moore does not fall within the coverage of the liability insurance policy and therefore, CNA had no duty to defend Governor Moore. The circuit court properly granted summary judgment to CNA.

## IV.

## CONCLUSION

Accordingly, for the reasons set forth above, the final order of the Circuit Court of Marshall County entered on April 7, 2003, is affirmed.

Affirmed.

Chief Justice MAYNARD concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

MAYNARD, Chief Justice, concurring, in part, and dissenting, in part.

This case required the Court to determine whether the circuit court's award of summary judgment in favor of CNA Insurance Company, d/b/a Continental Casualty Company ("CNA"), against former Governor Arch A. Moore, Jr., was appropriate. The majority opinion concluded that the trial court correctly granted summary judgment. For the reasons outlined below, I believe that the circuit court erred in granting summary judgment to CNA. Therefore, I concur, in part, and dissent, in part.

As the *majority correctly states,* "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963). In this case, I believe that further inquiry concerning the facts was essential with regard to all of the charges against Governor Moore. While it is clear to me that some of the claims against Governor Moore are unquestionably outside of the scope of coverage, we do not know enough, in my view, to make such a finding with regard to *all* of the claims against Governor Moore.

To this end, the circuit court's summary judgment order is inadequate because it does not specifically explain how the State's claims against Governor Moore fall under the exclusion provision of the State's insurance policy. We have held that:

Although our standard of review for summary judgment remains *de novo,* a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, in-

clude those facts which the circuit court finds relevant, determinative of the issues and undisputed.

Syllabus Point 3, *Fayette Co. National Bank v. Lilly,* 199 W.Va. 349, 484 S.E.2d 232 (1997). As such, this Court cannot perform its function unless the circuit court's order contains both the factual and legal basis for its ultimate conclusion.

In the instant case, given the circuit court's insufficient order, I feel that Governor Moore has demonstrated that factual determinations were still in question and that further inquiry was necessary by the circuit court as to whether he should have received a defense by CNA to the charges against him. This is further highlighted by the fact that in the Federal District Court case against Governor Moore, Senior Federal District Court Judge Richard L. Williams dismissed seven of the eight claims that he considered against Governor Moore in the State's civil action for which Moore sought a defense. *See West Virginia v. Moore,* 895 F.Supp. 864 (S.D.W.Va.1995). I believe that even though a jury could have ultimately found against Governor Moore (if he had not reached a settlement in the case), he conceivably may have been entitled to a defense.

In his July 27, 1995 order, Senior Judge Williams explained that the State would be limited in using Governor Moore's guilty plea to establish all of its claims against him. Judge Williams said:

The State also relies on Moore's guilty plea for evidentiary support. However, by his guilty plea, Moore has only admitted to extorting money which was not lawfully due and owing to him. The plea does not establish that Moore in any way interfered with [the United States Department of Labor] DOL. In fact, even if the Court were to accept as established the facts asserted by the U.S. Attorney at Moore's Rule 11 plea hearing (which it does not) nothing indicates that Moore interfered with DOL.

895 F.Supp. at 867, n. 3. Judge Williams further declared that the State did not meet its burden with regard to many of its claims against Governor Moore. Judge Williams said,

a plaintiff must show that he suffered an injury to his business or property proximately caused by the defendant's racketeering activities. Because the State cannot meet this burden, Moore's motion for partial summary judgment is granted in *substantial* part.

*Id.* at 868. (emphasis added.) In its summary of Judge Williams' memorandum opinion, West Publishing probably explained it best when it provided:

On former governor's motion for partial summary judgment, the District Court, Richard L. Williams, Senior District Judge, held that: (1) former governor's alleged racketeering activity allegedly resulting in state of West Virginia's refund to coal company of premiums paid to its black lung fund was not proximate cause of damages to state; (2) even assuming that defendant became governor solely as result of his alleged fraud, state suffered no compensable damages; (3) kickback allegedly paid to former governor and illegal campaign contributions he allegedly accepted were insufficient to establish RICO standing; (4) former governor's failure to report certain campaign contributions on his federal income tax form did not establish that he underpaid his state taxes; (5) even if former governor accepted bribes and unlawful campaign contributions and failed to disclose such payments, state failed to demonstrate reliance and damages elements of actual fraud; but (6) evidence raised genuine issue of material fact as to whether defendant was unjustly enriched through his conduct as governor, precluding summary judgment on state's unjust enrichment claim.

Furthermore, I believe that a simple review of some of the findings that Judge Williams made in his memorandum opinion in granting partial summary judgment to Governor Moore shows that there were sufficient factual disputes that would have rendered summary judgment inappropriate. Allow me to directly quote a few examples taken from the memorandum opinion entered by Senior Judge Williams, wherein he made the following findings and rulings:

- With respect to the refund, DOL officials, not Arch Moore or any other employee of the State of West Virginia, made all of the important decisions.
- The State's theory of damages simply is not supported by the evidence.... Kizer's companies would have qualified for a refund in January of 1986 because they had been approved by the Department of Labor for self-insured status. Therefore, the $2.2 million would not have remained in the fund until 1992 when money was transferred to cover a shortfall in the workers' compensation fund.
- The State has presented no evidence regarding DOL's process for evaluating Kizer's application to become self-insured.... Moore obviously had no control over a federal agency, and the State's own witness, after reviewing the file, found nothing improper about DOL's decision.
- Moreover, the causal chain asserted by the State is too weak to meet the proximate cause requirement for standing under civil RICO.
- Assuming Moore became Governor solely as a result of his alleged fraud, the State still suffered no damages—it would have paid a Governor's salary even if Moore had not committed fraud and another candidate had taken the office.
- The State also argues that it is entitled to recover the kickback paid to Moore by Kizer and the illegal campaign contributions accepted by Moore.... For the reasons noted above, the Court rejects this theory for RICO damages....
- The Court simply cannot find an issue of material fact on Moore's tax liability. The State has presented evidence, by virtue of the collateral estoppel effect of Moore's guilty plea, that Moore failed to report certain cash payments as income. The State has never presented evidence that Moore's failure to report those payments increased his tax liability. Through an audit, the State certainly could have tried to gather that evidence. For whatever reason, no such effort was made. Moore, on the other hand, has presented evidence through his affidavit that he owed no additional tax.
- Even if it were determined that Moore owed additional tax, the Court is not convinced that civil RICO is an appropriate method for the State to use in recouping that loss.... The State of West Virginia could have pursued Moore under state law remedies to retrieve any tax he owed but failed to pay. West Virginia Code § 11-10-1, *et seq.* To this date, West Virginia has failed to avail itself of this option. As such, the State cannot now claim an injury to its business or property and invoke the jurisdiction of the federal courts on a RICO claim in order to collect past due taxes.
- Even assuming that Moore perpetrated a fraud upon the State by accepting bribes and unlawful campaign contributions, the State has not raised genuine issues of material fact as to whether it relied on Moore's actions and was damaged thereby. As explained above, the State would have paid the Governor's salary regardless of Moore's racketeering activities—indeed, regardless of whether Moore was Governor.

Again, let me be perfectly clear, the quotations above are not my words. They are words taken verbatim from *West Virginia v. Moore,* 895 F.Supp. 864 (S.D.W.Va.1995). Accordingly, with these powerful findings of Judge Williams in mind, I feel that Governor Moore should have had the opportunity to introduce all of the evidence with regard to his contention that CNA was bound to provide a defense to the State's charges against him during a thorough trial before the circuit court. I further believe that it is important not to forget that even though many of the claims against Governor Moore were eventually dismissed by the District Court, he was still forced to accumulate significant legal fees as the case lingered for nearly five years. Thus, I believe that CNA Insurance Company is liable for at least some of Governor Moore's defense costs and that Governor Moore had a right to litigate how much of those costs should have been paid by CNA Insurance Company. Therefore, for the reasons stated above, I respectfully concur, in part, and dissent, in part.